AUSA: Timothy Ly

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

24 MJ 2807

UNITED STATES OF AMERICA

v.

STANLEY BRUCE, a/k/a "SB,"
and MAURICE ANDERSON, a/k/a "Bandz,"
a/k/a "Mo Mo,"

Defendants.

**SEALED COMPLAINT**

Violations of 18 U.S.C. §§ 922(a)(1)(A),
922(g)(1), 924(c)(1)(A)(1)(i), and 2; and
21 U.S.C. §§ 841(a)(1) and (b)(1)(C).

COUNTY OF OFFENSE:
WESTCHESTER

SOUTHERN DISTRICT OF NEW YORK, ss.:

KARMA SMITH, being duly sworn, deposes and says that she is a Special Agent with the Federal Bureau of Investigation ("FBI"), and charges as follows:

**COUNTS ONE THROUGH SIX**
**(Narcotics Possession and Distribution)**

1.      On or about the dates set forth below, in the Southern District of New York and elsewhere, STANLEY BRUCE, a/k/a "SB," the defendant, knowingly distributed and possessed with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1).

2.      The controlled substances involved in the offenses, as set forth below, were (1) mixtures and substances containing a detectable amount of cocaine; and (2) mixtures and substances containing a detectable amount of cocaine base, in violation of 21 U.S.C. § 841(b)(1)(C).

| Count | Date | Controlled Substance Involved | Penalty Provision |
|---|---|---|---|
| One | June 25, 2024 | Cocaine Base (approx. 50g) | 21 U.S.C. § 841(b)(1)(C) |
| Two | June 28, 2024 to June 29, 2024 | Cocaine Base (approx. 50g) | 21 U.S.C. § 841(b)(1)(C) |
| Three | July 7, 2024 | Cocaine (approx. 100g) | 21 U.S.C. § 841(b)(1)(C) |
| Four | July 15, 2024 | Cocaine (approx. 100g) | 21 U.S.C. § 841(b)(1)(C) |
| Five | July 21, 2024 | Cocaine (approx. 70g) | 21 U.S.C. § 841(b)(1)(C) |
| Six | July 25, 2024 | Cocaine (approx. 100g) | 21 U.S.C. § 841(b)(1)(C) |

(Title 21, United States Code, Section 841(a)(1), (b)(1)(C)).

## COUNT SEVEN
### (Possession of a Firearm During and In Relation to A Drug Trafficking Crime)

3.     On or about June 25, 2024, in the Southern District of New York and elsewhere, STANLEY BRUCE, a/k/a "SB," and MAURICE ANDERSON, a/k/a "Bandz," a/k/a "Mo Mo," the defendants, during and in relation to a drug trafficking crime for which they may be prosecuted in a court of the United States, namely, the distribution and possession with intent to distribute cocaine base as charged in Count One of this Complaint, knowingly used and carried a firearm, and, in furtherance of such crime, possessed a firearm, and aided and abetted the use, carrying, and possession of a firearm, to wit, a .22-caliber Baretta Model 71 pistol.

(Title 18, United States Code, Sections 924(c)(1)(A)(i) and 2.)

## COUNT EIGHT
### (Possession of a Firearm During and In Relation to A Drug Trafficking Crime)

4.     On or about July 15, 2024, in the Southern District of New York and elsewhere, STANLEY BRUCE, a/k/a "SB," the defendant, during and in relation to a drug trafficking crime for which he may be prosecuted in a court of the United States, namely, the distribution and possession with intent to distribute cocaine as charged in Count Four of this Complaint, knowingly used and carried a firearm, and, in furtherance of such crime, possessed a firearm, to wit, a Jimenez Arms Model J.A. 380.

(Title 18, United States Code, Sections 924(c)(1)(A)(i).)

## COUNT NINE
### (Possession of a Firearm After a Felony Conviction)

5.     On or about June 25, 2024, in the Southern District of New York and elsewhere, STANLEY BRUCE, a/k/a "SB," and MAURICE ANDERSON, a/k/a "Bandz," a/k/a "Mo Mo," the defendants, knowing they had previously been convicted in a court of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed a firearm, to wit, a .22-caliber Baretta Model 71 pistol, and the firearm was in and affecting commerce.

(Title 18, United States Code, Sections 922(g)(1) and 2.)

## COUNT TEN
### (Possession of a Firearm After a Felony Conviction)

6.     On or about July 15, 2024, in the Southern District of New York and elsewhere, STANLEY BRUCE, a/k/a "SB," the defendant, knowing he had previously been convicted in a court of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed a firearm, to wit, a Jimenez Arms Model J.A. 380, and the firearm was in and affecting commerce.

(Title 18, United States Code, Section 922(g)(1).)

## COUNT ELEVEN
### (Possession of a Firearm After a Felony Conviction)

7.      On or about July 15, 2024, in the Southern District of New York and elsewhere, MAURICE ANDERSON, a/k/a "Bandz," a/k/a "Mo Mo," the defendant, knowing he had previously been convicted in a court of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed a firearm, to wit, a 9mm Glock 26, and the firearm was in and affecting commerce.

(Title 18, United States Code, Section 922(g)(1).)

## COUNT TWELVE
### (Unlicensed Dealing of Firearms)

8.      Between at least in or about June 2024 through at least in or about July 2024, in the Southern District of New York and elsewhere, STANLEY BRUCE, a/k/a "SB," and MAURICE ANDERSON, a/k/a, "Bandz," a/k/a "Mo Mo," the defendants, neither one being a licensed importer, licensed manufacturer, or licensed dealer of firearms within the meaning of Chapter 44, Title 18, United States Code, willfully and knowingly engaged in the business of importing, manufacturing, and dealing in firearms, and in the course of such business shipped, transported, and received a firearm in interstate and foreign commerce, and aided and abetted the same, to wit, the defendants engaged in the business of dealing firearms.

(Title 18, United States Code, Sections 922(a)(1)(A) and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

9.      I am a Special Agent with the FBI, and I have been personally involved in the investigation of the charges described above. This affidavit is based upon my personal participation in the investigation of this matter, my conversations with other law enforcement officers, and my examination of reports, video, and other records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all of the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

### Initial Meetings with ANDERSON and BRUCE

10.      Based on my review of law enforcement records (including, among other things, video and audio recordings), my personal participation in the controlled buys, my conversations with the confidential source ("CS-1"), and my conversations with other members of law enforcement, I have learned the following:

        a.  In or about June 2024, CS-1 began working with the FBI to conduct controlled buys of narcotics from STANLEY BRUCE, a/k/a "SB."[1]

---

[1] CS-1 has previously cooperated with law enforcement authorities and is currently assisting the FBI with this investigation in exchange for compensation. CS-1 has a criminal history that

b.   Based on my conversations with other law enforcement officers and CS-1, as well as my review of law enforcement records, I have learned the following:

> i.   Prior to working with the FBI, CS-1 had been introduced to BRUCE in or about May or June 2024 through an individual ("Individual-1"). Individual-1 indicated to CS-1 that BRUCE obtained weapons from "down south."

> ii.   CS-1 had contact with BRUCE through FaceTime calls, voice calls, and text messages, as well as in-person meetings. During one of these conversations, BRUCE indicated that he knew someone who could sell CS-1 a Draco (*i.e.*, a firearm that looks similar to an AK-47 and uses 7.62x39mm rounds of ammunition).

11.   Based on my conversations with CS-1, I have learned the following:

a.   On or about June 24, 2024, CS-1 went to an apartment building located on McLean Avenue, Yonkers, New York ("Apartment Building"), to meet with STANLEY BRUCE, a/k/a "SB," the defendant. As CS-1 approached the Apartment Building, CS-1 walked towards an individual who resembled BRUCE but turned out not to be BRUCE. After CS-1 indicated that CS-1 was at the Apartment Building to meet BRUCE, the individual introduced himself to CS-1 as "Bandz"—whom law enforcement later identified as MAURICE ANDERSON, a/k/a "Bandz," a/k/a "Mo Mo," the defendant. ANDERSON stated that he was BRUCE's "brother" and that he was supposed to sell CS-1 a Draco but had sold it to someone else.

b.   ANDERSON and CS-1 then went to BRUCE's apartment ("Apartment") in the Apartment Building. There, with BRUCE present, ANDERSON showed CS-1 a firearm that was taken out of ANDERSON's right pocket. The firearm appeared to be a compact 9mm Glock 26 with an extended magazine capable of holding approximately 27-30 bullets. ANDERSON also showed CS-1 a chrome .40 caliber firearm. BRUCE then left the room and brought back a full-sized Glock to show CS-1. ANDERSON then offered to sell CS-1 a .22 caliber firearm with a silencer on it.

c.   During the same June 24, 2024 meeting with ANDERSON and BRUCE, CS-1 negotiated to buy 50 grams of crack cocaine for approximately $1,000 and a .22-caliber handgun with the silencer for approximately $500. At the time that CS-1 was negotiating the purchase of the crack cocaine and the handgun, both ANDERSON and BRUCE were present for the conversations about crack cocaine and the handgun.

### June 25, 2024 Controlled Buy

12.   Based on my participation in the controlled buy, my review of law enforcement records (including reports and audio and video recordings from the controlled buy), my conversations with CS-1, and my conversations with other law enforcement officers, I know the following:

---

includes multiple misdemeanor convictions related to firearms and theft, as well as felony convictions involving robbery and racketeering related offenses. CS-1 currently has no pending criminal charges. CS-1 has provided detailed information to law enforcement regarding BRUCE that has been corroborated, and CS-1 has proven reliable.

a.    On or about June 25, 2024, prior to the controlled buy, law enforcement searched CS-1 for contraband and determined that CS-1 had no contraband or money.  CS-1 was then outfitted with an audio and video recording device and provided with buy money.  As CS-1 drove to the Apartment Building to meet BRUCE for the controlled buy, CS-1 contacted BRUCE. BRUCE advised that "homie," who law enforcement understood to be referring to MAURICE ANDERSON, a/k/a "Bandz," a/k/a "Mo Mo," the defendant, gave him (BRUCE) the "business," which law enforcement understood to be referring to the .22-caliber handgun with the purported silencer.

b.    As confirmed by the audio and video recording and/or the debriefing of CS-1, at approximately 6:58 p.m., CS-1 entered the Apartment Building and went to BRUCE's Apartment. CS-1 met with BRUCE and, at BRUCE's direction, placed the $1,500 on a dresser in the Apartment. In exchange, CS-1 received approximately two clear plastic bags that both contained purported crack cocaine and a .22-caliber Beretta pistol with what appeared to be a silencer or suppressor attached to the barrel. Additionally, someone who CS-1 believed to be the mother of BRUCE's child retrieved a bag of ammunition and handed the bag to BRUCE. BRUCE provided the bag, which law enforcement later determined to contain approximately 35 rounds of .25 ammunition, to CS-1.

c.    Afterwards, CS-1 left the Apartment Building and drove back to a predetermined location to meet law enforcement officers, and on the way to the predetermined location, CS-1 was followed by law enforcement officers. After CS-1 arrived, law enforcement collected the .22-caliber Beretta pistol from under the driver's seat, and a box containing two bags of the purported crack cocaine and a bag of ammunition. Law enforcement searched CS-1's person for contraband and determined that CS-1 did not have any contraband. Law enforcement also searched CS-1's vehicle and found two .40 caliber rounds in the pocket of the driver's side door. Law enforcement questioned CS-1 about the .40 caliber rounds, and CS-1 denied any knowledge about the rounds and speculated that the rounds may have fell out of the box that contained the ammunition and the drugs. Although a law enforcement officer originally thought he heard that CS-1 was the only one who drove the car, later CS-1 clarified to another law enforcement officer and myself that CS-1 was not the only one who drove CS-1's car. Additionally, I have observed another individual get out of the driver's seat of CS-1's car when CS-1 was not present.

d.    During a debriefing with law enforcement, CS-1 indicated that when CS-1 was in the Apartment, the crack cocaine had already been cooked and was drying on paper towels. CS-1 further indicated that CS-1 watched BRUCE weigh the crack cocaine that he would give to CS-1, and that after CS-1 had received the bags of crack cocaine, CS-1 observed approximately 4 grams still in the Apartment.

e.    The City of Yonkers Police Department Forensics Science Laboratory tested both bags of purported crack cocaine and determined that both bags tested positive for cocaine base. They also weighed the cocaine base and determined the combined weight (without the plastic bags) was approximately 48.336g.

**June 28, 2024 Controlled Buy**

13.    Based on my participation in the controlled buy, my review of law enforcement records (including reports and audio and video recordings from the controlled buy), my

conversations with CS-1, and my conversations with other law enforcement officers, I know the following:

a. Between June 25, 2024 and the controlled buy that occurred on or about June 28, 2024, CS-1 communicated with STANLEY BRUCE, a/k/a "SB," the defendant, via cellphone. Through these communications, CS-1 arranged to purchase 50 grams of crack cocaine for $20 per gram, totaling $1,000, on June 28, 2024.

b. On or about June 28, 2024, CS-1 and BRUCE communicated via cellphone. BRUCE advised CS-1 that MAURICE ANDERSON, a/k/a "Bandz," a/k/a "Mo Mo," the defendant, worked that Saturday but after he finished work, would be going down to an area in or about Atlanta, Georgia. BRUCE stated that ANDERSON was a crane operator and not BRUCE's biological brother, but that they grew up together. CS-1 then ordered approximately 3-4 handguns, requesting that the caliber of the handguns be larger than .380 caliber and include "something that's going to spit," meaning something like a Draco or a MAC-10 (i.e., Military Armament Corporation Model 10).

14.    Based on my participation in the controlled buy, my review of law enforcement records (including reports regarding the controlled purchase and audio and video recordings from the controlled buy), surveillance video, my conversations with CS-1, and my conversations with other law enforcement officers, I know the following:

a. On or about June 28, 2024, prior to the controlled buy, law enforcement searched CS-1 and CS-1's vehicle for contraband and determined that CS-1 had no contraband or money. CS-1 was then outfitted with an audio and video recording device and provided with buy money. As CS-1 drove to the Apartment Building to meet BRUCE for the controlled buy, CS-1 was followed by members of law enforcement.

b. As confirmed by the audio and video recording, physical surveillance, the debrief of CS-1, and/or surveillance video, CS-1 arrived in the vicinity of the Apartment Building at or about 10:57 p.m., and at or about 11:00 p.m., BRUCE got into CS-1's car. Together, they began driving around Yonkers.[2] BRUCE and CS-1 then drove to the vicinity of Rollins Street. CS-1 gave BRUCE the buy money, and BRUCE got out of CS-1's car and then approximately three minutes later, got back into CS-1's car.

c. BRUCE indicated that he needed to get baking soda to make crack cocaine. CS-1 drove BRUCE to another location, where BRUCE indicated that he would pick up a Pyrex container so he could cook the powdered cocaine into crack cocaine. When they arrived, BRUCE got out of CS-1's car and did not return for approximately 48 minutes or so.

d. When BRUCE returned to CS-1's car, CS-1 and BRUCE drove back to the Apartment Building and entered, by which time it was approximately 1:35 a.m. on June 29, 2024,

---

[2] During the approximately three or so hours that CS-1 was driving around Yonkers or was otherwise with BRUCE on the evening of June 28, 2024 and into the early hours of June 29, 2024, law enforcement were not able to follow CS-1 the entire time. However, the facts pertaining to this controlled buy are confirmed by the audio and video recording.

then entered the Apartment. At the Apartment, BRUCE weighed the crack cocaine and gave CS-1 a single clear plastic bag containing purported crack cocaine.

e.    At or about approximately 2:00 a.m. on June 29, 2024, BRUCE and CS-1 had a conversation in person in or around the area outside the apartment Building. During that conversation, CS-1 confirmed with BRUCE that his order of "a big game and 2-3 small game" was "good." Based my training and experience, I understand that the reference to "game" here was to firearms. Furthermore, CS-1 asked BRUCE whether he had spoken to anyone about getting fentanyl for CS-1, and BRUCE stated he had not, but would talk to his "connect." BRUCE confirmed that ANDERSON would be going down to Decatur, Georgia—an area that is in the suburbs of Atlanta—to obtain the firearms. CS-1 reiterated that CS-1 needed at least three to four guns, and that once a gun was used to "hit a n*gga," it would need to be discarded. Based on my training and experience, "hit[ting]" here refers to killing, shooting, or shooting at someone.

f.    Officers from the City of Yonkers Police Department field tested the bag of chunky white substance, which yielded a positive result for cocaine base (*i.e.*, crack cocaine).

### Identification of "Bandz" as ANDERSON

15.    Based on my conversations with CS-1 and other law enforcement officers, I have learned that on or about the same day that CS-1 met MAURICE ANDERSON, a/k/a "Bandz," a/k/a "Mo Mo," the defendant (June 24, 2024), CS-1 saw ANDERSON driving a white Honda Accord in or about the area of the Apartment Building.

16.    Based on my review of cellphone location data, my involvement in visual surveillance, and my conversations with other law enforcement, I have learned the following:

a.    On or about July 2, 2024, cellphone location data for a cellphone associated with a phone number that ANDERSON provided to CS-1 ("ANDERSON's Cellphone") indicated that ANDERSON's Cellphone was in the vicinity of Station Road and Millwood Road in Millwood, New York. I traveled to that area looking for a white Honda Accord matching the description provided by CS-1.

b.    At approximately 1:45 p.m., I saw a white Honda Accord bearing a particular New York license plate number parked on Schuman Road (which intersects with Millwood Road and is one street over from Station Road) in front of an office building for a company that, based on my review of a publicly available website, specializes in tower cranes and construction hoisting. This is consistent with the description BRUCE provided to CS-1 of "Bandz" being employed as a crane operator. *See supra* ¶ 13(b).

c.    Later that day, cellphone location data indicated that ANDERSON's Cellphone was in the vicinity of Cleveland Street and the Taconic Parkway in Valhalla, New York. I traveled to that area looking for a white Honda Accord. At approximately 5:13 p.m., I saw the same white Honda Accord bearing the same license plate number that I saw parked earlier on Schuman Road now parked on Cleveland Street in front of a residential building.

17.    Based on my review of surveillance camera footage and cellphone location data for ANDERSON's Cellphone, I have learned that on or about July 5, 2024, at or about 5:16 pm., a white Honda Accord pulled into a parking spot outside a house on Cleveland Street (the "House")

7

and a black male got out of the driver's seat and entered the House. At or about 6:46 p.m. the same day, what appeared to be the same black male left the House, got into the driver's seat of the white Honda Accord, and drove away. Cellphone location data for ANDERSON's Cellphone indicates that between at or about 5:15 p.m. and at or about 6:50 p.m., ANDERSON's Cellphone was in or about the vicinity of Cleveland Street, and by the next cellphone ping at or about 6:56 p.m., ANDERSON's Cellphone was no longer in or about the vicinity of Cleveland Street, consistent with ANDERSON being the driver of the white Honda Accord.

18.    Additionally, based on my conversations with CS-1 and my participation in the investigation, I know that on or about July 7, 2024, law enforcement showed CS-1 a set of photographs of approximately six different individuals, including a photograph depicting ANDERSON. CS-1 identified the photograph of ANDERSON as the person CS-1 knows as "Bandz."

### July 7, 2024 Controlled Buy

19.    Based on my participation in the controlled buy, my review of law enforcement records (including reports regarding the controlled purchase and audio and/or video recordings from the controlled buy), surveillance video, my conversations with CS-1, and/or my conversations with other law enforcement officers, I know the following:

a.    On or about July 7, 2024, prior to the controlled buy, CS-1 made approximately three recordings of phone conversations in which STANLEY BRUCE, a/k/a "SB," the defendant, updated CS-1 on BRUCE's attempts to meet his supplier for the cocaine that he planned to sell to CS-1 later that evening.

b.    Prior to the controlled buy, law enforcement searched CS-1 and CS-1's vehicle for contraband and determined that CS-1 had no contraband or prerecorded buy money. CS-1 was then outfitted with an audio and video recording device and provided with buy money. As CS-1 drove to the Apartment Building to meet BRUCE for the controlled buy, CS-1 was followed by members of law enforcement.

c.    As confirmed by the audio and video recording, physical surveillance and/or debrief of CS-1, at or about 9:33 p.m., CS-1 arrived and met up with BRUCE in the vicinity of the Apartment Building. After CS-1 talked with BRUCE, CS-1 gave BRUCE $2,000. BRUCE then walked south on McLean Avenue. When BRUCE returned, he walked with CS-1 to an alleyway near the Apartment Building, where BRUCE handed CS-1 a plastic bag containing purported cocaine.

d.    CS-1 left and drove back to a predetermined location to meet law enforcement officers. After CS-1 arrived, law enforcement searched CS-1's person and vehicle for contraband and determined that CS-1 did not have any contraband other than the item CS-1 received from BRUCE.

e.    The City of Yonkers Police Department Forensics Science Laboratory tested the bag of purported cocaine and determined that it contained cocaine hydrochloride (*i.e.*, cocaine). They also weighed the cocaine and determined the weight (without the plastic bag) was approximately 99.768g.

**July 15, 2024 Controlled Buy**

20.    Based on my participation in the controlled buy, my review of law enforcement records (including reports regarding the controlled purchase, audio and video recordings from the controlled buy, and surveillance footage), debriefings with CS-1, and my conversations with other law enforcement officers, I know the following:

a.    Prior to the controlled buy, law enforcement searched CS-1 and CS-1's vehicle for contraband and determined that CS-1 had no contraband but did have $23.00 on his person, which was then taken into law enforcement custody for the duration of the controlled-buy operation. CS-1 was then outfitted with an audio and video recording device and provided with prerecorded buy money. As CS-1 drove to the Apartment Building to meet STANLEY BRUCE, a/k/a "SB," the defendant for the controlled buy, CS-1 was followed part of the way there by members of law enforcement.

b.    As confirmed by the audio and video recording, surveillance footage, and the debrief of CS-1, at or about 7:59 p.m., CS-1 arrived in the vicinity of the Apartment Building and at or about 8:02 p.m., met MAURICE ANDERSON, a/k/a "Bandz," a/k/a "Mo Mo," the defendant, in a hallway of the Apartment Building. There, CS-1 gave ANDERSON $600, and in return, ANDERSON gave CS-1 a white bag containing a 9mm Glock 26 with a partially loaded extended magazine, another regular magazine, and a Ziplock bag containing ammunition.

c.    BRUCE then entered the Apartment Building, after which, BRUCE, ANDERSON, and CS-1 entered the Apartment. In the Apartment, BRUCE gave CS-1 a silver Jimenez Arms Model J.A. 380 from a fanny pack that BRUCE was wearing, and CS-1 gave BRUCE $600 for the firearm and $200 for facilitating the gun buy with ANDERSON. BRUCE also gave CS-1 a handful of bullets that were later determined by law enforcement to be .380-caliber ammunition. BRUCE advised that he had not had time to cook the approximately 100g of cocaine into crack cocaine yet, to which CS-1 told BRUCE he would just take the cocaine as it was. BRUCE then took out a clear plastic bag with the purported cocaine, and handed it to CS-1. CS-1 then gave BRUCE $2,200 for the cocaine.

d.    Before leaving the Apartment, CS-1 asked BRUCE to get on ANDERSON and ensure CS-1's gun order (*see supra* ¶ 13(b)) was brought to New York so that CS-1 could buy them. CS-1 advised that he needed the guns to "hit" four houses (*i.e.*, commit robberies).

e.    CS-1 left the Apartment Building and drove back to a predetermined location to meet law enforcement officers. After CS-1 arrived, law enforcement searched CS-1's person and vehicle for contraband and determined that CS-1 did not have any contraband other than the items CS-1 received from BRUCE and ANDERSON. Law enforcement returned the $23.00 to CS-1.

f.    The City of Yonkers Police Department Forensics Science Laboratory tested the bag of purported cocaine and determined that it contained cocaine hydrochloride (*i.e.*, cocaine). They also weighed the cocaine and determined the weight (without the plastic bag) was approximately 99.592g.

**July 21, 2024 Controlled Buy**

21.     Based on my participation in the controlled buy, my review of law enforcement records (including reports regarding the controlled purchase and audio and video recordings from the controlled buy), conversations with CS-1, and my conversations with other law enforcement officers, I know the following:

a.    On or about July 21, 2024, prior to the controlled buy, law enforcement searched CS-1 and CS-1's vehicle for contraband and determined that CS-1 had no contraband but did have $37.00 on his person, which was then taken into law enforcement custody for the duration of the controlled-buy operation.  CS-1 was then outfitted with an audio and video recording device and provided with buy money. As CS-1 drove to the Apartment Building to meet BRUCE for the controlled buy, CS-1 was followed by members of law enforcement.

b.    As confirmed by the audio and video recording, surveillance video, the debrief of CS-1, and/or physical surveillance, CS-1 arrived in the vicinity of the Apartment Building at or about 10:19 p.m., and at or about 10:53 p.m., BRUCE got into CS-1's car. Together, CS-1 and BRUCE drove to a McDonald's parking lot in Mount Vernon, New York. During the drive, CS-1 gave BRUCE $1,540 for the cocaine. A minivan eventually pulled up into a parking spot next to CS-1's car, and BRUCE then entered the minivan for a short time before returning to CS-1's car. Both vehicles then drove away, with CS-1 driving back to the vicinity of the Apartment Building. BRUCE and CS-1 then entered the Apartment, where in an area that appeared to be the kitchen, BRUCE weighed out and then gave to CS-1 a single clear plastic bag containing purported cocaine.

c.    CS-1 left the Apartment and drove back to a predetermined location to meet law enforcement officers, and on the way to the predetermined location, CS-1 was followed by law enforcement officers. After CS-1 arrived, law enforcement searched CS-1's person and vehicle for contraband and determined that CS-1 did not have any contraband other than the item CS-1 received from BRUCE and $660 in leftover buy money.[3]

d.    During a debriefing with law enforcement, CS-1 indicated that after CS-1 had received the approximately 70 grams of cocaine, CS-1 observed there was still cocaine leftover in the Apartment. Law enforcement returned the $37.00 to CS-1.

e.    Officers from the City of Yonkers Police Department field tested the bag of powdery white substance, which yielded a positive result for cocaine hydrochloride (*i.e.*, cocaine).

**July 25, 2024 Controlled Buy**

22.     Based on my participation in the controlled buy, my review of law enforcement records (including reports regarding the controlled purchase and audio and video recordings from the controlled buy), debrief of CS-1, and/or my conversations with other law enforcement officers, I know the following:

---

[3] CS-1 had initially ordered 100g of cocaine, but because BRUCE's supplier only had 100g and BRUCE needed to keep some of the cocaine for himself, CS-1 negotiated to purchase just 70g of cocaine.

     a.  On or about July 25, 2024, prior to the controlled buy, law enforcement searched CS-1 and CS-1's vehicle for contraband and determined that CS-1 had no contraband but did have $323.00 on his person, which was then taken into law enforcement custody for the duration of the controlled-buy operation. CS-1 was then outfitted with an audio and video recording device and provided with prerecorded buy money. As CS-1 drove to the Apartment Building to meet STANLEY BRUCE, a/k/a "SB," the defendant, for the controlled buy, CS-1 was followed by members of law enforcement.

     b.  As confirmed by the audio and video recording, surveillance video, the debrief of CS-1, and/or physical surveillance, CS-1 arrived in the vicinity of the Apartment Building, entered the Apartment Building at or about 8:23 p.m., and then entered the Apartment. BRUCE and CS-1 went into a backroom of the Apartment, where BRUCE gave CS-1 a single plastic bag containing purported cocaine, and in exchange, CS-1 gave $2,200 to BRUCE. BRUCE then told CS-1 that he needed to pay his supplier, at which time BRUCE exited the Apartment Building, went into a minivan briefly, then returned to where CS-1 was in front of the Apartment Building.

     c.  Based on my review of the audio and video recording, I have learned that while CS-1 and BRUCE were talking outside the Apartment Building, BRUCE offered "40 shells" to CS-1, which CS-1 understood to mean .40-caliber bullets, but CS-1 declined to accept the bullets.

     d.  CS-1 left the vicinity of the Apartment Building and drove back to a predetermined location to meet law enforcement officers, and on the way to the predetermined location, CS-1 was followed by law enforcement officers. After CS-1 arrived, law enforcement searched CS-1's person and vehicle for contraband and determined that CS-1 did not have any contraband other than the item CS-1 received from BRUCE. Law enforcement returned the $323.00 to CS-1.

     e.  Officers from the City of Yonkers Police Department field tested the bag of purported cocaine, which yielded a positive result for cocaine hydrochloride (*i.e.*, cocaine).

    23.  Based on my review of court and criminal history records for STANLEY BRUCE, a/k/a "SB," the defendant, I have learned that on or about August 24, 2012, BRUCE was convicted in the Southern District of New York of conspiracy to distribute and possess with intent to distribute cocaine base, in violation of 21 U.S.C. § 846 ("Count One"), and using, possessing and discharging a firearm during and in relation to a drug trafficking offense, in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) and 2 ("Count Two"). On or about February 15, 2013, BRUCE was sentenced principally to 80 months' imprisonment on Count One (with that sentence on that count being "reduced by 39 months so long as that means that the sentence is not below sixty months"); 84 months' imprisonment on Count Two; and 4 years' post-release supervision. BRUCE's supervised release is set to expire on or about April 10, 2027.

    24.



████████████████████████████████

25.     Based on my communication with a Special Agent from the Bureau of Alcohol, Tobacco, Firearms and Explosives who is familiar with the manufacturing of firearms and ammunition, I know that the .22-caliber Baretta Model 71 pistol, Jimenez Arms Model J.A. 380, and 9mm Glock 26 were not manufactured in New York state.

WHEREFORE, I respectfully request that warrants be issued for the arrest STANLEY BRUCE, a/k/a "SB," and MAURICE ANDERSON, a/k/a "Bandz," a/k/a "Mo Mo," the defendants, and that they be arrested, and imprisoned or bailed, as the case may be.

/s/ Karma Smith by JCM w/permission

KARMA SMITH, Special Agent
Federal Bureau of Investigation

Sworn to me through the transmission of this
Complaint by reliable electronic means (FaceTime), pursuant
to Federal Rules of Criminal Procedure 41(d)(3) and 4.1, this
1st day of August, 2024

THE HONORABLE JUDITH C. McCARTHY
United States Magistrate Judge
Southern District of New York